ALW:MAA
F.#2006R00083
F.#2006V00772

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

JOSEPH F. SIMONE,

        Defendant.

- - - - - - - - - - - - - - - X

**FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ APR 5 2007 ★
BROOKLYN OFFICE**

I N F O R M A T I O N

Cr. No. 07-179 (JG)
(T. 18, U.S.C., §§ 1349,
981(a)(1)(C) and 3551
et seq.; T. 21, U.S.C.,
§ 853(p); T. 28, U.S.C.,
§ 2461(c))

THE UNITED STATES ATTORNEY CHARGES:

INTRODUCTION

At all times relevant to this Information, unless otherwise indicated:

The Firms

1. Wedbush Morgan Securities, Inc., ("Wedbush") was a financial services firm that maintained its principal office in Los Angeles, California. Wedbush also maintained branch offices throughout the United States, including an office in New York, New York. Wedbush was a member of both the New York Stock Exchange ("NYSE") and National Association of Securities Dealers ("NASD"). Wedbush was also a broker-dealer of securities registered with the United States Securities and Exchange Commission ("SEC").

2. Van der Moolen Specialists USA, LLC, ("VDM Specialists") was a NYSE member firm that acted as the registered

specialist for over 350 NYSE-listed securities. Purchases and sales of securities on the NYSE are typically executed through specialists who work on the NYSE trading floor. Among other things, specialists execute buy and sell orders in particular securities on behalf of other NYSE member firms. VDM Specialists was formed in or about July 1999 when Van der Moolen Holding NV, an international securities trading firm based in the Netherlands, acquired several NYSE specialist member firms, including a firm called Lawrence O'Donnell Marcus, LLC ("Lawrence O'Donnell"). As a result of the merger, Lawrence O'Donnell and the other firms consolidated their operations and became VDM Specialists. VDM Specialists was a broker-dealer of securities registered with the SEC.

The Stock Loan Business

3. In the securities industry, financial institutions and their customers often engage in transactions that require them to borrow securities from other financial institutions. This creates an opportunity for financial institutions to make a profit by engaging in "stock loan transactions" that involve the lending and, sometimes, the borrowing and re-lending of securities. The stock loan departments at Wedbush, Lawrence O'Donnell and VDM Specialists were in the business of attempting to profit by engaging in stock loan transactions.

3

4. In a typical stock loan transaction, a financial institution that needs to borrow a security communicates that need to other financial institutions known to engage in the stock loan business. Upon locating an institution with a supply of the security it needs, the borrowing institution and the lender will establish several financial terms for the stock loan transaction. These terms typically include: (a) the form of the collateral, which is often cash; (b) the amount of the collateral, which is typically based on the market value of the securities being borrowed; and (c) the fees that will be paid in connection with the transaction.

5. When the stock loan transaction is consummated, the borrower pays the cash or other collateral to the lender and, in exchange, the lender delivers the securities to the borrower. The lender can then earn interest on the cash collateral by using the cash to make low risk short-term loans to other financial institutions. When a stock loan transaction involves securities that are widely available, the lender will typically keep a portion of the short-term interest as a lending fee and pay the remaining interest, often referred to as a "rebate," back to the borrower. When a stock loan transaction involves securities for which the supply is extremely limited, often referred to as "hard to borrow" or "tough" stocks, the lender generally keeps all short term interest earned on the collateral provided by the

borrower, and, in addition, the borrower usually pays a fee, known as a "negative rebate," back to the lender as a premium for providing the "hard to borrow" security.

Stock Loan Finders

6. A stock loan finder is a third party to a stock loan transaction that, in exchange for a finder's fee, assists a borrower in locating securities the borrower needs. Less frequently, a finder may also assist a lender in finding a borrower for securities that the lender has available to lend. Most finders are not registered broker-dealers. Finder's fees are typically paid from the profits that either the borrower or the lender earns in connection with a particular stock loan transaction.

The Defendant

7. In or about and between the late 1980s and June 1997, the defendant JOSEPH F. SIMONE was employed as the head of Wedbush's stock loan department in New York, New York. In or about and between June 1997 and January 2005, SIMONE was employed in New York, New York, as the co-head of the stock loan department at Lawrence O'Donnell and its successor firm, VDM Specialists. SIMONE was a resident of Staten Island, New York.

Island Capital Management, Inc.

8. Island Capital Management, Inc. ("Island") was a New York corporation that maintained an office in Long Island,

New York, and listed its address on certain bank accounts as being in Staten Island, New York. In or about and between the 1980s and the mid-1990s, Island operated principally as a stock loan finder firm. In or about the mid-1990s, the defendant JOSEPH F. SIMONE became the undisclosed principal of Island and took control of Island's operations. In or about and between the mid-1990s and January 2005, SIMONE regularly used Island as his nominee to obtain fees from his employers, Wedbush, Lawrence O'Donnell and VDM Specialists, in connection with stock loan transactions where Island had provided no legitimate finder services.

The Fraudulent Scheme

9. In or about and between 1995 and January 2005, both dates being approximate and inclusive, the defendant JOSEPH F. SIMONE, together with others, devised, implemented, oversaw and participated in a scheme to defraud Wedbush, Lawrence O'Donnell, VDM Specialists and several other financial institutions (the "Subject Firms") in connection with stock loan transactions.

10. As part of this scheme, in or about the mid-1990s, the defendant JOSEPH F. SIMONE secretly obtained control over Island's operations. Under SIMONE's direction, Island held itself out to be a stock loan finder firm, even though it engaged in little or no legitimate finder business.

6

11. As a further part of this scheme, in or about and between 1995 and January 2005, the defendant JOSEPH F. SIMONE secretly agreed to pay kickbacks in the form of cash and other things of value to individuals who were employed in the Subject Firms' stock loan departments. In exchange, the Subject Firms' employees caused the Subject Firms to: (a) enter into stock loan transactions involving numerous securities (the "Subject Securities") with the defendant JOSEPH F. SIMONE's employers, Wedbush, Lawrence O'Donnell and VDM Specialists; and (b) pay and receive rebates and negative rebates in connection with these transactions that were, on many occasions, less favorable to the Subject Firms than the rebates and negative rebates being offered by other firms that were competing with SIMONE in the marketplace. SIMONE subsequently caused Wedbush, Lawrence O'Donnell and VDM Specialists to re-lend the Subject Securities to other financial institutions at the prevailing market rates for substantial profits.

12. The Subject Firms' employees owed their employers a duty of loyalty and honest services and were required to make business decisions in the best interests of their employers, without regard to their own personal gain. As the defendant JOSEPH F. SIMONE well knew and believed, the Subject Firms' employees violated their duties to their employers by participating in the kickback arrangement.

13. As a further part of this scheme, the defendant JOSEPH F. SIMONE caused Wedbush, Lawrence O'Donnell and VDM Specialists to pay a significant portion of the profits derived from the fraudulent stock loan transactions to Island for purported finder's fees. In fact, Island generally did not render any finder services in connection with these transactions. SIMONE then obtained cash, either directly or indirectly, from Island and used a portion of that cash to pay the kickbacks to the Subject Firms' employees.

14. As a further part of this scheme, the defendant JOSEPH F. SIMONE caused Wedbush, Lawrence O'Donnell and VDM Specialists to pay bogus finder's fees to Island in connection with certain stock loan transactions in which SIMONE earned profits for his employers without the assistance of the Subject Firms' employees. SIMONE caused his employers to pay these finder's fees to Island, even though Island had not rendered any finder's services. As a result, a portion of the profits that Wedbush, Lawrence O'Donnell and VDM Specialists were entitled to earn on these transactions was improperly diverted to SIMONE.

15. As a further part of this scheme, the defendant JOSEPH F. SIMONE removed a portion of his ill-gotten gains from Island's bank accounts by causing Island to transfer funds by wire and check to accounts controlled by an unindicted co-conspirator. The unindicted co-conspirator secretly converted

these funds into cash for SIMONE, in exchange for a fee. In addition, SIMONE caused Island to transfer a substantial amount of money by wire and check to several of his family members.

## CONSPIRACY TO COMMIT SECURITIES FRAUD AND WIRE FRAUD

16. The allegations contained in paragraphs 1 through 15 are realleged and incorporated as though fully set forth in this paragraph.

17. In or about and between the 1996 and January 2005, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant JOSEPH F. SIMONE, together with others, did knowingly and intentionally conspire:

   a. to execute a scheme or artifice to defraud Wedbush, Lawrence O'Donnell, VDM Specialists and the Subject Firms by depriving them of money and property and to defraud the Subject Firms by depriving them of the intangible right of honest services of their employees, in connection with securities of issuers with a class of securities registered under Section 12 of the Securities Exchange Act of 1934, to wit, the Subject Securities, all in violation of Title 18, United States Code, Section 1348; and

   b. to devise a scheme and artifice to defraud Wedbush, Lawrence O'Donnell, VDM Specialists and the Subject Firms, and to obtain money and property from Wedbush, Lawrence

O'Donnell, VDM Specialists and the Subject Firms by means of materially false and fraudulent pretenses, representations and promises, and to deprive the Subject Firms of the intangible right of honest services of their employees, and for the purpose of executing such scheme and artifice, and attempting to do so, to transmit and cause to be transmitted, by means of wire communication in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343.

(Title 18, United States Code, Sections 1349, 1346 and 3551 et seq.)

### CRIMINAL FORFEITURE ALLEGATION

18. The United States hereby gives notice to the defendant JOSEPH F. SIMONE that, upon his conviction of the above-charged offense, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), of any property constituting or derived from proceeds obtained directly or indirectly as a result of such offense, including but not limited to proceeds equal to three million, six hundred thousand dollars and no cents ($3,600,000.00) in United States currency.

19. If any of the above-described forfeitable property, as a result of any act or omission of the defendant JOSEPH F. SIMONE:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

(c) has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any

11

other property of the defendant up to the value of the forfeitable property described in this forfeiture allegation.

(Title 28, United States Code, Section 2461(c); Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853(p))

*Roslynn R. Mauskopf*
ROSLYNN R. MAUSKOPF
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

# AFFIDAVIT OF MAILING

STATE OF NEW YORK
COUNTY OF KINGS
EASTERN DISTRICT OF NEW YORK, ss:

_____, being duly sworn, says that on the _____ day of _____, I deposited in Mail Chute Drop for mailing in the U.S. Courthouse, Cadman Plaza East, Borough of Brooklyn, County of Kings, City and State of New York, a _____ of which the annexed is a true copy, contained in a securely enclosed postpaid wrapper directed to the person hereafter named, at the place and address stated below:

_____
_____
_____

Sworn to before me this
    day of

_____
_____

# AFFIDAVIT OF PERSONAL SERVICES

STATE OF NEW YORK
COUNTY OF KINGS
EASTERN DISTRICT OF NEW YORK, ss:

_____, being duly sworn, says that he is employed in the office of the United States Attorney for the Eastern District of New York. That on the _____ day of _____, he served a true copy of the annexed _____ on the office of attorney for _____ herein, located at _____, Borough of _____, City of New York, by leaving a true copy of same with his clerk or other person in charge of said office.

_____

Sworn to before me this
    day of

***** FACSIMILE COVER SHEET *****

APR 05 2007 09:42

Message To:

☎ 917186132456

Message From:

7182547480